May it please the Court, Doug Northup representing the defendant, Appellant Syntellect. I'd like to reserve three minutes of my time for rebuttal. As the Court knows, this is a summary judgment appeal. Our client asked only did it get the day in court that the district court denied. Nothing more, nothing less. There are numerous questions of fact that precluded summary judgment in the first instance. This is an indemnity case, an express indemnity case. California law governs and California law is clear that indemnity provisions are strictly construed against the indemnity. As the Hepler v. J.M. Peters case said, had the parties intended to include an indemnity provision that would apply regardless of the subcontractor's negligence, they would have had to use specific, unequivocal, contractual language to that effect. Well, let me just jump in. I mean, I'm sympathetic to the second of the two arguments you raised in your brief, but maybe you can start with this first one on why your client shouldn't at least be found liable for something, some form of ______. Well, that's the fact questions. If it had something to do with infringement, then perhaps it should be held accountable in some respect. But what the district court has done is essentially made our client an insurer of an entire automated call system. Okay, but put aside. I know you're saying that they're trying to hold your client liable for stuff that your client didn't do, right? I understand that, and that's the second argument. But I'm talking about the first argument. The Katz complaint specifically lists services that your client's product provided as the basis for the infringement claims. Let me address that directly, Your Honor, because with all respect, even though that's SoCal's position, that is demonstrably not true. It has to be shown actualized infringement by Sintelec. Counsel argues in their brief at page 18, citing pages 56 through 71 of a request for proposal, functionality in the system, access account information, sign up for new services. It then ties those same things to the Katz complaint and says, see, look, Katz alleged these exact same things. But when counsel's citing to the request for proposal, what it is citing to is appendix B, which from section 2.1.1 of the request for proposal says there will be separate systems and call flows for each of the SGC systems. However, the menus will be the same. The current call flows are contained in appendix D of this document for reference. What SoCalGAS was saying in the request for proposal is these call flows exist. When someone calls in and wants to pay a bill or do whatever, these are the numbers they punch and the flows that have to be used. Your IVR has to maintain that same functionality and integrate with that same functionality. But by saying if in fact the system, the automatic call center infringed because of the allegations in the Katz complaint, it infringed before the IVR was ever changed. That's admitted in their brief. Well, just let me make sure I got this much straight at least. I follow what you're saying. But the product that your client provided to them does allow for somebody to basically, let's say, schedule an appointment for somebody to come out to the house without talking to a human being, right? Not in and of itself, no. This is a system made up of ten different components. I know, but I'm saying the value that you were adding to the system, I guess, was that your client has this proprietary technology that allows the delivery of that service, right? Our client provided an interactive voice response unit. It's not the only one that provides them. And every automated call system in existence has an interactive voice response unit in it. But this particular one was used to allow automated customer service. That was the purpose of the RFP was to allow automated customer services to sign up for services, transfer services, schedule service requests, request a bill, enter a meter read, report a gas leak, and perform. This was an RFP. All of these were in the RFP as the functions that the IVR was supposed to facilitate. Your Honor, the reason there are so serious questions of fact is the system did all of those things identically before the IVR was changed. Then they were foolish to buy your product. I mean, what you're saying is we provided nothing. I mean, I can't understand that because the system is defined in the indemnity to include hardware, software, and services, and services are defined to include the custom application programs, which my colleagues have been discussing with you, which are designing and implementing a system to handle customer calls of this sort. Your Honor, the point is this. Mr. Katz had method or process patents. It said your system infringes because it does all of these things. The system did all of those things. The IVR might do it faster or, you know, upgrading an IVR, but the system, if it infringed, infringed before the IVR was changed because all of the things that Mr. Katz alleged that the automated call center did, it did before the IVR was changed. Was there an automated call center before the RFP? Absolutely there was, Your Honor, for years. And, in fact, the reason that's so significant in Section 2.2.1 and those call paths that counsel compares to the Katz complaint, what the RFP said was this is what our call flows are now. Anyone who implements a new IVR, you have to be able to maintain those same call flows and the same functionality. So there was nothing added? There was nothing in terms of what Katz alleged because if you look at the call flows in counsel's brief on page 18, he says this is what was in the RFP and those were the existing call flows? I'm not sure why that even matters. And let me just explain what my – I may be looking at this too simplistically, but let's say the previous supplier infringed the patents and then you came along with your new automated customer service system and you also infringed patents. I don't really understand why it matters that there may have been infringement before your system came along. So long as your activities were in connection with the system that you implemented, it seems to me that the infringement case applies and so does the indemnity. I really – Let me address that, Your Honor, because that's an important point. If the automated call center – no one has alleged that the prior IVR infringed, and in fact, if Mr. Katz's allegation is right, the automated – that's the questions of fact, Your Honor. If you look at – But I'm saying why is that a material question of fact? Just because it's like saying, you know, you stole something from McDonald's and you say, well, that guy did it too. I don't really understand why that matters. Here's why, Your Honor. If the automated call center infringed before the IVR, this indemnity clause says, intellectual defend, indemnify, and hold harmless against all claims arising from actual or alleged infringement by Syntellect in connection with the system which is the IVR. If, in fact, the system already – the automated call center infringed, this isn't by Syntellect. And that's the key question. That's not – no. I think we're all having the same issue here. Indemnity could have said, Your Honors, that by – Counsel, I think this is – more than one thing can infringe the same patent. That's the problem, right? And you actually point this out in your argument. You say that, hey, Kat sued a bunch of other companies that don't even use our product. And that's exactly right. A bunch of different companies' products that do the same thing could infringe the same patent. And the question here, Your Honor, there was all kinds of questions about whether this was actual or alleged infringement by Syntellect. That's the question. That's a question that a jury should determine because, as we mentioned, there are the existing call pass. There are the fact that the lawyer – But that has to do with the underlying litigation, doesn't it? And not this litigation. No, that – it is all about what Kat's – what was actual or alleged. Because all Kat said was, broadly, your automated call center – They alleged that your client infringed. No, not at all, Your Honor. None whatsoever. Mr. Cotting, who's a lawyer – So were you not a – was your client not a defendant in the underlying litigation? Absolutely not, Your Honor. No component manufacture. In fact, counsel points this out. Mr. Katz, at one point, said to Syntellect, oh, we think your IVR infringes. Syntellect met with Katz, and Katz never sued Syntellect. He never sued any IVR supplier. But you – exposure. There was exposure. But that's the whole question, Your Honor. Because if Katz alleged this whole package of things, you know, And the system already did that. Then there's a serious question about whether that's infringement by Syntellect. And all we're asking is the opportunity to show that. The lawyer who did the non-infringement opinions in the Katz litigation for SoCalGas said, I never looked at whether the IVR, the Syntellect product, infringed because Katz was alleging the entire functionality, this process patent, was violated. And that's what we should have the right to do, for example. But that's more an apportionment issue, don't you think? It's really not, Your Honor. Because if it's determined that Katz didn't allege infringement by Syntellect, you don't even get there. And it alleged by Southern California Gas. Pardon? It alleged that Southern California Gas. It alleged the automated call center infringed the process patent by doing end uses. And the indemnification agreement. And in terms of an important point, to try to get around the problems with the by Syntellect language, what Southern California Gas says as well, but Syntellect could have been guilty of direct infringement. But we've cited the cases. In order for there to have been a direct infringement alleged, Katz in his lawsuit would have had to allege that Syntellect's product violated every element of his patents. The case law is clear on that. You can't just say it functions in the end use. You have to allege every step in the patent. But this is an indemnification case. This is not a case where Katz sued Syntellect directly. Yeah, it's an indemnification case. Exactly. But the question is, he sued SoCal Gas, not Syntellect, and we have to determine was there actual or alleged infringement by Syntellect. And we have to determine whether or not the indemnification agreement covers. Exactly. And the cases, the Hepler case and others, Your Honors, have said, especially if you're going to be indemnified against your own negligence, in here we know this system, the IVR, was installed in 2001. Katz didn't sue until 2007. It's a matter of contract. What the indemnification agreement said, not what Katz sued for, but what the indemnification clause said, that your client would be responsible. You have to look at both of those, Your Honor, though, because as the cases have said, if Syntellect's going to be held to be the insurer of non-infringibility of an entire automated call system, including changes to the system over the six years after the IVR was installed, which is admitted by SoCal's guess, changes to the functionality, that's something the parties could agree to, but that's not what this indemnity says. Well, it's really broad. It says that supplier, that's you, shall indemnify company against any and all claims of any kind whatsoever arising from actual or alleged infringement by supplier of any patent in connection with. Infringement by supplier. Any patent in connection with the system. It doesn't require that it be the whole system or every part of the system. It just has to be in connection with it. But that's the key. It has never been determined by a fact finder whether this was actual or alleged infringement by Syntellect. And that's the key. And that's why I keep pointing to the fact that what's being, they say Katz alleged in his complaint is what the system did before the IVR was replaced. But that argument doesn't help you. That's your argument that it infringed before and I just helped it infringe more. No. That's not a winning argument. Because if that were the case, you could arguably, even though that's not in the case to be talking about indirect infringement or inducing infringement, Your Honor, but if the parties were going to say by installing an IVR in an existing system, Syntellect becomes the insurer of the non-infringement of that system, they could have done that, but that's not what they said. Because you use in connection with, which is a very broad phrase. But it has to be a causal connection by Syntellect. The Hepler case we cite, Your Honor, directly addresses that. The St. Paul Fire and Marine. And here there's evidence that the infringement was the result of actions by SoCal Gas in changing things after the IVR was installed. If that's true, and counsel and I might disagree about this violently, if that's true, the infringement isn't by Syntellect. That's the key. That part of it was never determined. And that's why in this case, Your Honor, there's all kinds of evidence in the case. In this lawsuit, CAT sued, I think there were 40 defendants. There were only two of them that had a Syntellect IVR. Every one of those had an IVR in them. If it's infringement by Syntellect, why weren't all the other IVR manufacturers sued? Counsel, you're down to one minute if you'd like to say more. Your Honor, in terms of the no cases, in terms of the allocation, I want to jump to that. I think that's pretty clear. Maybe you want to save some time for rebuttal. I think it's a good period. Okay. I'll save my time for rebuttal then. Thank you. Thank you, counsel. May it please the court, Jason Wilson on behalf of Apelli Southern California Gas Company. Let me first discuss what Syntellect did. By the way, I find it very curious that Syntellect mentions that the system infringed before. It was Syntellect's IVR in there before. I think the panel is quite right, though. It doesn't matter what happened before. Let's talk about what Syntellect's business is. Syntellect's business, and they admit this in their answer, which is that supplemental excerpt of Record 12, is that they provide automated customer service solutions to utilities. That's their area of expertise. The specific product that they sell to do that is called the Vista IVR software. Before we bought that product from them, they said to us, our product will allow you to automate your customer service transactions. One product that they sold to us was the Vista IVR software. The other product, they sold us a whole suite of goods, but the other major piece of software that they sold us were these custom application programs, which allowed us to use the IVR to perform certain functions, such as report a gas leak, make a payment. So they sold us many things in the 33-page contract and the 89-page request for proposal. The two major things, though, were two products, an IVR system that, by their own admission, automates customer service. Their president said that. It's in the excerpt of Record. The president said, hey, what does your IVR do? It automates customer service. And also their experts said that you could not infringe the CAS patents, and this is at supplemental excerpt of Record 6, unless you had an IVR. So what they were selling to us was the functionality of automation, and they also sold us specific software programs that allowed us to provide specific automated software functions, like report a gas leak, pay a bill. What did CAS sue us for? What are the CAS patents about? The CAS patents are not aimed at call centers. If you look at paragraph 26 of CAS' patents, which is at excerpt of Record 381, CAS says, my innovation is that I have patents that cover the integration of telephone systems with databases. I cover the automation of that. And so that's what CAS says its patents do in paragraph 26, excerpt of Record 381. And then when he got around to suing us, what he said is, you, Southern California Gas, you provide automated services, you have an automated system, and the automation that you provide allows you to do things like have automated make a payment, automated report a gas leak. We got sued precisely for the products and services that Centelec sold to us. So opposing counsel says that it's you, your client, who infringed the patent from Mr. Katz and that there's no opportunity for summary judgment as to whose fault it really was at this point and that that's a factual issue. Is there a factual issue? And if not, why not? There is no factual issue. First of all, just a little bit about patent law. In patent law, multiple people can infringe. So the supplier can infringe by selling us a supplying product. It's easier to tell if it's nuts and bolts. Right, it's easier to tell if it's not nuts and bolts. But if you're selling us software, and actually the law is if you just offer to sell us software, if you offer to sell us software, sell us software, make the software, and actually in this case they used their own software because they had to test it before they gave it to us, then you can be a infringer. We can be an infringer too if we use somebody else's infringing software. The actual customer who calls in and benefits from the system, they can be sued too. The patent holder only picks one person in the chain because they only can collect one licensing fee. And then that person, if they want to protect themselves, has to have a contractual arrangement with someone else. So in response to your question, you don't have to have a trial as to whether or not Southern California Gas could have been sued for infringement because that isn't necessary to decide whether or not Southern California Gas is entitled to coverage under the indemnity agreement. And what's very important about the indemnity agreement and what makes it very broad is it says, we get coverage if there's an allegation of infringement. And what California courts have recognized is if you get coverage if there's an allegation of infringement, that necessarily makes the coverage very broad. Whose allegation? I mean, counsel also made the point that because CATS didn't sue them directly, where do you get the allegation from? Is it enough for you to allege it and therefore get the indemnity? What they said early, I think this is answered, Your Honor, but what they said in their opening brief. In their opening brief, at page 31 of their opening brief, they say, well, how do you interpret the terms by Cintellect in connection with? And what they said at page 31 of the opening brief is you look at that by saying, hey, does it refer to work that we did? So the way we would look at this case is take CATS' allegation of infringement and look at what Cintellect did for us, which was providing two products that automated the system, and decide if Cintellect's products fit within the allegation. And I would submit, Your Honor, that they fit like a hand in a well-fitted glove. That the allegations of infringement by CATS, which were for automation, fit exactly the two big products that they sold us, both of which automated services. One in a general sense, one in a very specific sense. So in this case, no trial was necessary because the court had before it, in the four corners of the contract, one of the pieces of software was described by the four corners of the contract, and there was never an assertion below that that contract was ambiguous or they needed extrinsic evidence to interpret it. In fact, they tried to get summary judgment against us, and they said that there's no reason to admit extrinsic evidence. So if you look in the four corners of the contract, the four corners of the contract, which includes the RFP, describes the second software, the custom application programs that implement the services that CATS says was infringing. Okay, I mean, I really want to hear what you have to say on the apportionment issue. Yeah, I'm going to go straight to the apportionment issue now. So we think they fall in, the agreement covers them. Should there be any apportionment? And the key link of apportionment is, if you take the indemnity clause, the first part of the clause is, any and all claims, actions, suits, proceedings, losses, liabilities, penalties, damages, costs or expenses, including attorney's fees, and disbursements of any kind. And then here are the two key words, the words that kill them on apportionment, arising from alleged or actual infringement. By scintillate. By scintillate. Let me ask you, I'll just get straight to the heart of my concern. The way you structured the settlement with CATS seems to me to raise a serious factual question about whether you paid for infringement that encompasses much more than the product that they provided. And maybe you can walk me through why in the world you decided to calculate the payment to CATS based on the total number of minutes that the entire system used. Okay, and I can walk that through, and actually it's in the record below. That's a good question. It's in Paul Battle's deposition. I may not remember the Excel for Records site. Every call that CATS wants a licensing fee for passes through the IVR. So what happens is a call comes in, it goes to the IVR. The IVR decides that's their product. The IVR decides, hey, is that a transaction that you can do self-service? So you call into our system, you punch in your account number, and they say, oh, make a payment. And maybe that's something you can do self-service by punching in your credit card. If you say, no, I don't want to do it self-service, the IVR says, okay, what's your problem? And they say, my problem is I have a question about my bill. The IVR then routes that to an agent, and then the agent handles your problem. Every minute that we paid for at some point passed through the IVR because that's the point of automation. So it's a red herring issue. You said that 63%, I think it was, of the minutes for which you paid. It's not even spent, though, in the part of the system that they provided you. It's after the call is routed. Okay, so why? But, again, I'm just saying. That's just the way CATS said. Automation allows you to, in a smart fashion, route the call to the agent with information about the account or have it self-serve so that the software that they give us allows us to perform those two automated functions. If I understand your argument, it is that the entire call is, quote, in connection with, end quote, the system because it has to pass through the system. And once it reaches a live person, there may be no infringement at that moment because if you called that live person directly, there would be no infringement. But you didn't call that live person directly, so you're saying that the entire transaction, therefore, passes through the system. That's what CATS claims, that their patent's entitled. What CATS would say is, hey, if you had an old-time call center and all you did is there were machines that would distribute the calls to live operators and then the live operator would look up your account in a computer database, if that's what happened, I don't get any money. But if you use a system, a software system like an IVR, to direct those calls and match it up with information from the customer database, that infringes my patent. So you're exactly right. But let me just, I mean, I'm looking at this diagram. I don't know quite where it came from, but you'll recognize it. Okay, yes. Okay, so there are these other peripheral components that you agree that they did not supply. They did not supply. There are minutes that you paid him for that represent time that was spent in these other. No, my recollection is the following. First of all, I want to agree with Your Honor that you're quite right, that any other minute that we spent elsewhere was still in connection with the system that they provided, and I think it's covered by the broad indemnity, because it says any claims arising from, any and all claims, and damages arising from the infringement. So I think the broad indemnity language takes care of these other minutes. Let's say I don't accept that. But what I'm saying is, what Katz is claiming is, your whole function of automation is what's directing the call. That's my innovation. So it doesn't matter to me, and you have to pay for minutes when it's going to a customer service representative, because that customer service representative benefits from my innovation, right? A licensing fee is based upon the benefit of my innovation. That customer service representative, when they handle the call, benefits from my innovation, because that call is already matched up with the account information from the computer. The customer service representative doesn't have to pull that information off. You're going to handle that call more efficiently, because of my innovation of integrating the incoming calls with the computer database. So the reason why we paid a licensing fee to Katz, is that Katz's position is, my innovation benefits you, whether or not it's self-service, it's all done within a software program, or if it's done with an operator after hitting the software program. Counsel, do you call off hand the contract amount? What was the dollar amount for this contract? I believe it was $842,000, Your Honor. So they knew about this risk. These are two big boys here. They're one of the biggest providers of IVR services. They knew about Katz before we did. They knew that they were agreeing to broad language like arising from, and I want to emphasize arising from. Allocation would imply that the connection language is caused by, but there's specific case law, and the continental casualty case indicates that the specific case law says that arising from is much broader than caused by. It just means growing out of, originating from. So I think you can't ignore arising from. If you buy their allocation, if you buy their position of allocation, you're substituting arising from with caused by. And maybe you prevail on that at trial, but I don't see any basis for depriving them of the opportunity to go before a jury and at least make their case. Well, I disagree, Your Honor, because ultimately the interpretation of the word arising from is a judicial function of determining what those words mean, and I think it covers minutes that arose in connection with the system and arose from the work that they did. So I don't think there's a jury issue here because no jury is absent an allegation that extrinsic evidence is needed. No jury here would properly interpret what the term arising from means. I think I'm out of time. Thank you, Counselor. You are. Thank you very much. Thank you very much. And, Mr. North, if you have a bit of time remaining. I'll try to be very brief. The document that Your Honor, Judge Watford, Paul's pointing to is very pertinent. Every call. What's the excerpt page for that? The SEOR 34. Every call comes into this system through the ASPECT call center before it can even go to an IVR. That's not a SENELEC product. There are numerous others at the ASPECT portal, mainframes, data marts, call pass CTI. The automated call center cannot function without any one of those. But do you agree with him that every single minute that got charged in that settlement came through your system? No. Every single call comes in through the ASPECT call center. Initially you go to. I think that wasn't Judge Watford's question. I think his question, or maybe my question, is every minute that is involved in the CATS settlement, did all of those calls pass through your system? No. Some of them came through and never went through your system? Initially everything goes to the automated system. But when they go to a live operator, they go out of the IVR. Mr. Battle says that. It's undisputed. It is no longer in the IVR at all. Wait, wait, wait. You're losing track of my question. My question was with respect to the calls covered by the CATS settlement with the gas company, did each of those calls pass through your IVR system? It's a yes or no question. My understanding is that yes, they did before they were put out of the system to the live operator. Then you and opposing counsel agree on that fact. You just don't agree on its legal significance. Exactly. And the Hepler case. Why is that an issue of fact? Because, Your Honor, the question is when 63% of the minutes are not in the IVR, and, again, why aren't we talking about the aspect call center where everything comes in? What about the mainframes that have to be used for all these automated call centers? The question is what damages were caused by Sintelec's actual or alleged infringement? And the evidence has been clear on the record below, expert testimony and their own witnesses. You again used the phrase caused by. So what's your response to counsel's argument that caused by and arising from and in connection with are different? Because the case law that's been cited, they have no case that says that on allocation. The Hepler v. J.M. Peters case makes clear in these situations a plaintiff in a contract case has to sue breach and what damages were caused by the breach and not by something else. That's the key. And the Hepler case said the plaintiffs were asking for an instruction. They were entitled to a rebuttable presumption that non-settling subcontractors were liable for the amounts that the indemnity paid to settle the claims, but the law does not so provide. This is worse because there was no allocation made. There it was subcontractors, and I believe they were roofers, what part of the damage did you cause? Here they're saying we have to pay the whole amount. They made demands on other component suppliers that precluded discovery into that, saying to them they were liable for the very same injury, but they decided to pursue Sintelec for reasons that we don't know. Thank you, counsel. The case just argued is submitted, and again, we appreciate the very helpful arguments from both of you in this challenging case.
judges: Graber, Rawlinson, Watford